RINALDI & SONS, INC., Formerly Known as BELLA DONNA PACKING CO., INC., Appellant, v WELLS FARGO ALARM SERVICE, INC., a Division of BAKER PROTECTIVE SERVICE, INC., Formerly CENTRAL STATION SIGNALS, INC., Respondent.

Second Department, May 5, 1975

*David H. Deitsch* for appellant.

*Berman & Frost (Saul Goldstein* of counsel), for respondent.

CHRIST, J. The plaintiff, a subscriber to a burglar alarm monitoring and reporting system operated by the defendant, brought suit based upon the defendant's negligent failure to perform its contractual duty to report a signal which "might indicate illegal entry", for the amount the plaintiff lost as the result of a successful burglary of some 483 cartons of cheese, most of which weighed between 50 and 100 pounds, from its warehouse.

The issues in this appeal are (1) whether a party contractually bound to report to police a signal which "might indicate illegal entry" is guilty of negligence or breach of contract when it fails to report or immediately investigate a signal in the alarm apparatus which normally indicates a breakdown in equipment which is not the result of tampering, but which by its nature may indicate a tampering with the alarm system by a burglar, and (2) whether a clause purporting to be a "liquidated damage" clause in a contract for burglar alarm protection which fixes the maximum liability for any loss at $50 is valid, either as a provision for liquidated damages, or as one to limit liability where more protection is allegedly available, upon request, for a negotiable fee.

The plaintiff operated a restaurant supply warehouse in Brooklyn from which approximately 30,000 pounds of cheese, about $200 in cash and a truck were taken on or about April 28, 1972.

The warehouse was equipped with a burglar alarm reporting service operated by the defendant pursuant to a contract under which its sole obligation was to telephone the police and the plaintiff, "if a signal is received in the Central Station which might indicate illegal entry." For this service the plaintiff paid an installation charge of $37.50 and $10 per month for monitoring.

The alarm device was a system of wired circuits and switches around windows and doors, and around more likely crime targets. For example, in the instant case the "cheese box"—a walk-in refrigerator in which perishable restaurant supplies were stored—was so wired. A disturbance of the wiring system circuits by the opening or moving of a protected item triggered the alarm, which emitted a broken circuit signal which defendant monitored by means of a so-called McCollogh Loop. That device consisted of a party telephone line, extending out in a loop from a central monitoring office, over many miles, to each of the from 4 to 10 subscribers on a single loop line. Out of the loop at each protected premises a drop line, connected and identical to the ordinary telephone wiring, linked the interior system to a central station where the defendant maintained its 24-hour surveillance of all protected premises. Each subscriber on the loop line had a uniquely coded signal to enable the monitoring station to discern which of the premises connected to the loop was experiencing alarm system disruption. The party-line system

had a counterpart, a single, private-line system which transmitted for one location only, available at a higher cost, but the plaintiff had chosen the cheaper system.

The party-line McCollogh Loop, as well as transmitting up to 10 coded signals of a broken circuit, could also produce an uncoded "open circuit" signal, which indicated that, somewhere along the miles of loop line, including the extensions of line into protected premises, a break had occurred in the loop wiring, as opposed to a break in the circuits protecting the premises. Such a wiring break could be caused by a "grounding" of the wires, by wetness or by other technical problems. It could also be caused, as we find it was in the instant case, by a deliberate cutting or breaking of the telephonic transmission lines. A cutting of the transmission line rendered the alarm device incapable of transmitting any alarm signal. At the time of the burglary in question, there was no way of immediately ascertaining either the exact location of the break in the transmission wire or the specific cause of the open circuit signal.

Upon receipt of an open circuit signal, the defendant's practice was merely to call the telephone company, which would search out the area of the damage and repair it. Such a search could take anywhere from 10 minutes to 10 days. In the interim, depending upon the defect causing the open circuit, the defendant's reporting station might not be able to continue to receive coded alarm signals from any or all of the particular line's subscribers. No calls were made by the defendant and no precautions were taken by it in the ordinary case to secure party-line premises when it received an open circuit signal, other than to call the telephone company.

The burglary of the plaintiff's premises appears to have been one of a number of significantly similar burglaries of premises protected by McCollogh Loops (see, e.g., *H. G. Metals v Wells Fargo Alarm Servs.*, 45 AD2d 490; *Day Surgicals v Wells Fargo Alarm Servs.*, N.Y.L.J., Dec. 5, 1972, p 20, col. 8). In each of those cases, literally tons of goods were loaded into trucks by a person or persons unknown over a period of from two to four hours, apparently after the telephone transmission line had been cut. According to the plaintiff's expert, burglars, upon seeing premises protected by the monitoring system, would cut the identical outside transmission and telephone lines and then take cover to see if there was a response. If the premises had a direct line, cutting it would send a signal to

which the defendant would notify the police to respond. If, however, the premises depended upon a McCollogh Loop, there would be no response because, instead of a coded signal indicating a broken circuit, the line transmitted only an open circuit signal. If cutting the line evoked no response, the plaintiff's expert opined, the burglars deduced that they had disarmed the monitoring system and had to worry only about the local alarm, if any, in the generally industrial areas, usually deserted at night, in which the burglaries often took place.

We find that the following facts were proved by a preponderance of the evidence adduced at trial. At about 2:00 A.M. on April 28, 1972, persons unknown cut the telephone and burglar alarm system wires outside the plaintiff's warehouse. They then waited and watched from a distance until it was clear that the police would not respond to the scene. Upon the cutting of the wire, the defendant began receiving an open circuit signal on the plaintiff's McCollogh Loop, which it reported to the telephone company, but to no one else. The burglars then broke through the warehouse's concrete roof to avoid setting off the local alarm and, once inside, disarmed the local alarm by removing all of the alarm apparatus from the wall. The burglars removed approximately 30,000 pounds of cheese from the cheese box and loaded it onto the plaintiff's truck, moved the 600-pound safe some 90 to 95 feet into the cheese box, where it was opened and emptied, and vandalized the warehouse, in a period of not less than two hours. The open circuit signal, as admitted at the trial by the defendant, could "mask an illegal entry."

On these facts, the defendant was contractually bound to report the signal which, it admitted, might mask an illegal entry *(H. G. Metals v Wells Fargo Alarm Servs.,* 45 AD2d 490, *supra;* cf. *Melodee Lane Lingerie Co. v American Dist. Tel. Co.,* 18 NY2d 57 [liability found where a water detection signal in the central office was ignored because the signal was known to be malfunctioning; on the occasion it was ignored it was actually reporting flooding]).

It must also be found that the failure to report the signal was the proximate cause of the plaintiff's losses in view of the nature of the burglary. Had the defendant reported the signal, any reasonably timely police or other response would have prevented the losses here incurred, since the process and technique used by the burglars took a bare minimum of at

least two hours (cf. *H. G. Metals v Wells Fargo Alarm Servs., supra).* It is true that due to the nature of the loop system the defendant could not pinpoint the location of the defective wiring. This necessitated calling the police with 6 to 10 addresses and, additionally, calling 6 to 10 subscribers. However, even the most leisurely response would have thwarted this burglary, the accomplishment of which required a great deal of time.

Liability in this case is limited to $50 by a contractual provision for "liquidated damages". Although the provision is not validly one for liquidated damages, it can be construed as one for limited liability and, as such, it limits the plaintiff's recovery to $50. The clause was not hidden and this court finds that the defendant successfully established that more coverage was available for a negotiable fee. Because of the nominal fee the plaintiff paid for the alarm service, it would be unfair to hold the defendant liable for the grossly disproportionate losses sustained by the plaintiff *(Melodee Lane Lingerie Co. v American Dist. Tel. Co., supra; Ciofalo v Vic Tanney Gyms,* 10 NY2d 294; *Conklin v Canadian-Colonial Airways,* 266 NY 244).

HOPKINS, Acting P. J. (dissenting in part). I dissent in part and vote to reverse the judgment and to grant a new trial limited to the issue of damages.

I concur with that portion of the majority opinion finding liability, proximate cause and facts sufficient to sustain a verdict for the plaintiff.

I dissent from that portion of the opinion which validates the contractual clause limiting the defendant's liability to $50. The clause in the instant case was in a form contract, indicating that it was not bargained upon. The defendant produced no schedule of increasing liability for increasing charges and admitted that such a schedule did not exist. Any increase was to be individually figured in the event it was requested.

The standard $50 limit did not in any way reflect recognition of the potential loss possibilities in the event that the defendant did not perform its sole contractual obligation. This was not a validly bargained limitation clause, but an unfair, invariable and unconscionable, and thus unenforceable, provision.

Further, the bald negation of liability for the failure to perform its single duty did not specify that the defendant was

excusing itself even for its own negligence. Although a sufficient limitation may be valid, the limiting clause must be clear and specific. The clause in the instant case merely stated that liability was limited in the event of the defendant's "failure to perform" the contractual services, without mentioning negligence. If the defendant wished to free itself of liability for its own negligence, it should have so specified (see *Van Dyke Prods. v Eastman Kodak Co.,* 12 NY2d 301).

The defendant's liability should not be limited. A boilerplate clause limiting liability for the defendant's failure to perform its sole contractual duty, without specification or limitation, to an amount grossly disproportionate to cognizable potential losses, should not be upheld.

LATHAM, BENJAMIN and MUNDER, JJ., concur with CHRIST, J; HOPKINS, Acting P. J., dissents in part and votes to grant a new trial limited to the issue of damages, with an opinion.

Judgment of the Supreme Court, Kings County, dated August 22, 1973, reversed, on the law and the facts, and judgment is directed to be entered in favor of plaintiff in the amount of $50, plus interest.

Appeal from an order of the same court, dated March 23, 1974, dismissed as academic in view of the determination herein on the appeal from the judgment.

Plaintiff is awarded a single bill of costs to cover both appeals.